UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

LYNDA LEGRAND,                                                                    Case No. 24-cv-429

                                        **Plaintiff,**                            **COMPLAINT**

       -against-                                                                  *Jury Trial Demanded*

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC.,

                                        **Defendant.**
------------------------------------------------------------------------X

       Plaintiff Lynda Legrand ("Plaintiff") by her attorneys Goddard Law PLLC, whose offices

are located at 39 Broadway, Suite 1540, New York, New York 10006, alleges upon knowledge

with respect to herself, and upon information and belief as to all other matters, as follows:

                              **PRELIMINARY STATEMENT**

       1.      Defendant Consolidated Edison Company of New York, Inc. publicly commits

themselves to "cultivating a diverse workforce" that "ensure all employees feel included and also

have a sense of belonging as they cultivate a purpose in the work they do."[1]

       2.      Behind closed doors, however, Defendant Consolidated Edison Company of New

York openly rejected its commitment to diversity in favor of blatant discrimination, harassment,

and retaliation.

       3.      Plaintiff brings this action against Defendant Consolidated Edison Company of

New York, Inc. to remedy claims of discrimination on the basis of gender, race, religion, and

retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), 42

U.S.C. § 1981, the New York State Human Rights Law, the New York City Human Rights Law,

---

[1] https://www.coned.com/en/about-us/diversity/diversity-by-the-numbers

1

and the new York Labor Law, together with any and all other causes of action which can be reasonably inferred from the facts as set forth below.

4.      Plaintiff seeks declaratory relief, monetary, and punitive damages.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

5.      Jurisdiction of the Court is proper under 42 U.S.C. § 2000e *et seq*., and 28 U.S.C. §§ 1331 and 1343.

6.      The Court has supplemental jurisdiction over the claims of Plaintiff brought under State law pursuant to 28 U.S.C. § 1367.

7.      Venue is proper in the here pursuant to 28 U.S.C. § 1391(b), as the acts complained of herein occurred within the Southern District of New York.

8.      All conditions precedent to filing the instant action have been fulfilled. On or about August 1, 2022, Plaintiff timely filed a Charge of Discrimination with the New York District Office of the Equal Employment Opportunity Commission ("EEOC").

9.      On or about October 23, 2023, the EEOC issued Plaintiff a Notice of Right to Sue. This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue.

## PARTIES

10.      Plaintiff Lynda Legrand ("Plaintiff") is a Black female citizen of the United States who was at all relevant times, and continues to be, a resident of the State of New Jersey. Plaintiff worked at Defendant Consolidated Edison Company of New York, Inc.'s headquarters in New York.

11.      Upon information and belief, Defendant Consolidated Edison Company of New York, Inc. ("Defendant ConEdison") is an energy company that provides electric, gas and steam service to more than 3 million customers in New York City and Westchester County, New York,

2

organized and existing under the laws of the State of New York, and authorized to do business in the state of New York, with its corporate headquarters at 4 Irving Place, New York, New York 10003-3502.

12.     At all relevant times, Defendant ConEdison was an "employer" under all relevant statutes.

13.     At all relevant times, Plaintiff was an "employee" of Defendant ConEdison within the meaning of all relevant statutes.

## FACTUAL ALLEGATIONS

### Plaintiff Begins Working at Defendant ConEdison and Has Great Success

14.     In or about June 2001, Plaintiff began working at Defendant ConEdison as a Customer Service Representative.

15.     Since that time, Plaintiff has held critical roles within Defendant ConEdison as a Program Manager, Electrical Operations Supervisor, Training Lead Instructor, and a Customer Operations Supervisor.

16.     Plaintiff ascended through the ranks, earned well-deserved promotions, and received consistent, positive feedback and stellar reviews from her managers and supervisors.

### Plaintiff Begins Working as a Regional Coordination Leader and Reports to Manager Brian Yee-Chan

17.     In or about October 2019, Plaintiff was internally hired as a Manhattan Regional Coordination Leader at Defendant ConEdison.

18.     Plaintiff was responsible for coordinating Defendant ConEdison's construction work in advance of the Department of Transportation milling.

19.     Plaintiff was directly supervised by Manager Brian Yee-Chan ("Manager Yee-Chan").

**Manager Brian Yee-Chan Visibly Prefers White, Male Employees at Defendant ConEdison**

20. When Plaintiff began reporting to Manager Yee-Chan in or about October 2019, Manager Brian Yee-Chan was responsible for approximately 10 reports.

21. Among the 10 reports, 8 of the reports were white and non-Black—3 white, female reports, 1 female Asian/Indian report, and 4 white, male reports.

22. Plaintiff and Coworker Tiffany Crawford ("Coworker Crawford") were the only Black, female employees who reported to Manager Brian Yee-Chan.

23. Immediately, Plaintiff discerned a glaring disparity in Manager Yee-Chan's treatment of Black, female employees compared to their white, male counterparts at Defendant ConEdison.

24. For example, Manager Yee-Chan developed close friendships with numerous white, male subordinates, notably Chris Karageorgos ("Coworker Karageorgos").

25. However, when it came to Plaintiff and Coworker Crawford, Manager Yee-Chan was noticeably cold and distant and purposefully restricted discussions to work. He appeared to be purposefully avoiding the personal connection and warm relationship he had with white employees with Plaintiff and Coworker Crawford.

26. In fact, Manager Yee-Chan frequently communicated with Plaintiff and Coworker Crawford in a humiliatingly stern manner and frequently exhibited a dismissive and demeaning attitude towards them.

**Plaintiff Receives an Overwhelming Workload in
Comparison to Similarly Situated White Employees at Defendant ConEdison**

27. When Plaintiff began her Regional Coordinator position, she was assigned to the Manhattan borough. Plaintiff was the sole Regional Coordinator for Manhattan.

28.    Plaintiff was immediately taken back by the outrageous caseload and was shocked to learn that she had approximately three times the work of white Regional Coordinators at Defendant ConEdison.

29.    For example, despite the fact that the Westchester area was assigned significantly less cases than Plaintiff's area, the Westchester area had 4 white employees assigned to work on the cases together. Yet, Plaintiff was the only employee covering the Manhattan borough.

**Manager Yee-Chan Treats Plaintiff Less-Favorably
Than White, Similarly Situated Employees at Defendant ConEdison**

30.    When Plaintiff complained to Manager Yee-Chan that her workload was too much for one person, he continually ignored her complaints, expressed irritation, and insisted that she continue to be solely responsible for and successfully complete all of the work.

31.    After Plaintiff continually complained about her overwhelming caseload, Manager Yee-Chan begrudgingly assigned her two private contractors to assist her with her caseload—rather than additional Regional Coordinators. Contractors were only temporary employees and hired to augment staffing for a short period of time.

32.    Yet, when the white, female employees assigned to the Westchester area requested help or expressed concern with their workload, Manager Yee-Chan was warm and patient and immediately recruited additional Regional Coordinators to join their team to assist them.

**Coworker Crawford is Terminated for Being Late**

33.    In addition, Manager Yee-Chan held Black, female employees at Defendant ConEdison to a higher standard than white, male employees.

34.    On or about October 2, 2019, after Coworker Crawford was late for a meeting, Manager Yee-Chan promptly sent an aggressive email, abruptly terminating Coworker Crawford and demanding the immediate return of her computer and accessories the following day. Manager

Yee Chan wrote the following: "October 4th will be the last day of your assignment. I am being called for jury duty on 10/4 and will not be in the office for the turnover, so I would like to ask that you turn in all Con Ed property (including the 2 computers and any accessories) after we conclude tomorrow's meeting at Van Nest. Tomorrow's meeting for advanced training will still be held as scheduled."

35.    However, when Manager Yee-Chan thereafter sent an email to HR Client Coordinator, Yaniri Checo on or about October 3, 2019 notifying Defendant ConEdison that Coworker Crawford surrendered her ConEdison computer and equipment, he lied and wrote "I documented performance issues per the email below, but I never directed her to surrender her ID before the contract end date of 10/4/19," despite the fact that he did in fact demand that she return them prior to October 4, 2019 on October 3, 2019.

36.    Plaintiff was horrified, as white, male Employees were regularly late for meetings but not terminated, and certainly not abruptly.

37.    Plaintiff felt especially uncomfortable to realize that she was the only Black female left on Manager Yee-Chan's team.

**Manager Yee-Chan Treats Coworker Crawford's White Male Replacement Warmly**

38.    Thereafter, Manager Yee-Chan hired Ivan Khilko ("Coworker Khilko")—a white male, to replace Coworker Crawford.

39.    Throughout 2021, Coworker Khilko exhibited an array of documented performance issues, including not being prepared for meetings, forcing managers to repeat expectations, and needing managers to fill in for him.

40.    In contrast to the way Coworker Crawford was treated, Manager Yee-Chan was patient, forgiving, and never threatened to terminate or discipline Coworker Khilko.

**Plaintiff Requests a Religious Accommodation**

41.    In or about 2021, as per the New York City COVID-19 Vaccine mandate, Defendant ConEdison employees were required to provide proof of receiving their COVID-19 vaccine by December 8, 2021.

42.    On or about October 29, 2021, Plaintiff submitted the following reasonable accommodation request for her sincerely held religious beliefs to Defendant ConEdison's Office of Diversity and Inclusion and Manager Yee-Chan, requesting a religious exemption from receiving the COVID-19 vaccine:

*"I am a devout Christian seeking an exemption from Con Edison's recent announcement that it is requiring its employees to be fully vaccinated against COVID-19 before December 8, 2021. Kindly accept this letter explaining in further detail the core, fundamental teachings and beliefs I strongly hold in faith and the basis for why I cannot in morality receive the vaccine without compromising my closely held religious beliefs. Fundamental to the Christian faith is a teaching that requires Christians to refuse a medical intervention, including a vaccination, if his or her informed conscience comes to this sure judgment. While the Christian faith does not prohibit medical procedures and in fact, generally encourages the use of safe and effective medical intervention as a means to both, safeguard individuals and further mitigate any public health exposures, this is the general rule–it is not absolute…"*

43.    Thereafter, the Office of Diversity and Inclusion requested that she provide additional documents.

44.    When Plaintiff responded that she did not have any additional documents to provide, the Office of Diversity and Inclusion never responded to Plaintiff.

45. During this time, Coordination Leader, Tamara Soodan ("Coworker Soodan"), also requested a religious accommodation for her sincerely held religious beliefs.

**Plaintiff is Asked to Train Less-Experienced White Coworkers**

46. On or about November 3, 2021, Manager Yee-Chan sent Plaintiff an email in which he acknowledged her contributions to the team and requested that Plaintiff train his close friend, Coworker Karageorgos, and Natalie Ramos—a white female, prior to a scheduled FMLA leave she had coming up on December 1, 2021.

47. Plaintiff agreed to do so, of course.

48. From December 1, 2021, to January 13, 2022, Plaintiff was out on FMLA leave.

49. During this time, on or about December 9, 2021, shortly after Plaintiff and Coworker Soodan requested religious exemptions and unbeknownst to Plaintiff, Manager Yee-Chan abruptly removed Plaintiff and Coworker Soodan's photo and Coordination Leader title from a Shuffle presentation slideshow, which was to be presented on December 9, 2021.

50. Upon information and belief, Manager Yee-Chan removed Plaintiff from the slideshow because he planned to re-assign her to a less-favorable position upon her return from FMLA leave.

**Manager Yee-Chan Takes Away Plaintiff's Responsibilities
in Retaliation for Requesting a Religious Accommodation**

51. On or about January 13, 2022, Plaintiff returned to work from her FMLA leave.

52. On or about January 13, 2022, before Defendant's Office of Diversity and Inclusion even made a decision regarding Plaintiff's religious accommodation request, Manager Yee-Chan curtly informed Plaintiff that he would not be assigning her to a borough to manage and instead, would be placing her in a less-favorable Project Specialist Role.

8

53.    When Plaintiff asked why, Manager Yee-Chan expressed his belief that Plaintiff would not "still be employed with the company" given her recent religious accommodation request and let her know that he did not want to "confuse the stakeholders by putting too many different faces as Regional Leaders in the position." He stated that he anticipated needing to replace Plaintiff after she was terminated from Defendant ConEdison due to her accommodation request.

**Plaintiff is Demoted and Replaced by A**
**<u>Less-Experienced and Less-Qualified White, Male Employee</u>**

54.    Manager Yee-Chan thereafter removed Plaintiff from the Org Charts as a Regional Leader.

55.    On or about January 13, 2022, Plaintiff was replaced by Coworker Karageorgos, who had only recently began working at Defendant ConEdison, was recently trained for the position by Plaintiff in November 2021, and had less experience and was less qualified for the position than Plaintiff.

**Plaintiff and Coworker Soodan are Demoted and Excluded**
**<u>from Newsletters due to their Religious Accommodation Requests</u>**

56.    In addition, Manager Yee-Chan thereafter removed Coworker Soodan from the Org Charts as a Regional Leader.

57.    On or about January 4, 2022, Defendant ConEdison published a newsletter featuring its employees. Plaintiff and Coworker Soodan were both excluded from the document without any regional borough to support. Plaintiff and Coworker Soodan were included in the newsletter in prior years. Yet, Coordination Leaders who had not requested religious accommodations were now named in the newsletter who were never listed as Regional Coordinators before.

9

58.    On or about January 14, 2022, Defendant ConEdison published a Newsletter for the Department of Transportation. Once again, Plaintiff and Coworker Soodan were the only Coordination Leaders excluded from the newsletter.

**White Employees are Continually Elevated at Defendant ConEdison
Despite Documented Performance Issues and Despite Being Less Experienced
and Qualified for the Position than Similarly Situated Black, Female Employees**

59.    In or about January 2022, white, male Coworker Khilko—who was previously hired to replace Coworker Crawford, was promoted to a Regional Leader Position by Manager Yee-Chan despite exhibiting an array of documented performance issues from 2021.

60.    Coworker Khilko was less-experienced and less qualified for the position than Coworker Crawford—who was abruptly terminated from Defendant ConEdison.

**Manager Yee-Chan Insists that Plaintiff Begin
Searching for a New Job Despite her Excellent Performance**

61.    On or about February 22, 2022, Plaintiff received her 2021 performance review from Manager Yee-Chan.

62.    During the meeting, Manager Yee-Chan praised Plaintiff for her performance in 2021 and congratulated her for a job well done and "exceeding her 2021 operational excellence goals" and noted that she had a "knack for meeting deadlines."

63.    Thereafter, Manager Yee-Chan brought up her new Project Specialist Role—which she was forced into after Manager Yee-Chan expressed his belief that Plaintiff would soon be terminated from Defendant ConEdison due to her recent religious accommodation request.

64.    Manager Yee-Chan let Plaintiff know that although she met one of the main goals of the Project Specialist role by saving Defendant ConEdison money, she needed to "work on her emotional intelligence" and thereafter insisted that Plaintiff begin searching for a new job, either inside or outside of the company, that "best suits her skill set and is more of a natural fit."

65.    Plaintiff was in complete disbelief that Manager Yee-Chan deemed her lacking in emotional intelligence. Throughout her interactions with Manager Yee-Chan, there had never been any conflicts, arguments, or altercations.

**Manager Yee-Chan Takes Away Plaintiff's Raise**
**Despite her Excellent Performance Review for the Previous Year**

66.    According to Defendant ConEdison's Management Variable Pay Program policy, Band 2H Project specialists who exceeded their Performance/ Operational Excellence goals were entitled to receive a 9% raise.[2]

67.    Plaintiff exceeded her 2021 Performance/Operational Excellence goals and, based on her Band 2H Project Specialist level was entitled to receive a 9% raise.[3]

68.    Despite this, Manager Yee-Chan did not award Plaintiff a raise.

69.    Upon information and belief, Manager Yee-Chan awarded similarly situated white, male coworkers a 9% raise, as he was required by Defendant ConEdison's Management Variable Pay Program policy.

**Plaintiff Notifies Manager Yee-Chan of a Metrics Error**

70.    In or about March 2022, another manager told Plaintiff that an SI dashboard assignment she and Manager Yee-Chan were working on failed to meet his expectations because the metrics Manager Yee-Chan used to calculate the missed opportunities and dollars saved would not work for the Staten Island and Brooklyn area because they were based on estimates. During their conversation, the manager emphasized that Manager Yee-Chan's metrics were the sole reason that the project failed to meet his expectations.

---

[2] See Exhibit A
[3] See Exhibit B

71.     On or about March 10, 2022, Plaintiff sent Manager Yee-Chan the following text message informing him that the metrics he provided failed to meet the other manager's expectations:

*"Hey Brian, quick update on the meeting:*

*The report that Chris and Yvonne is working on, Arvin considers it to be 0% complete until they receive good working data from Chris. The last information Chris sent didn't work for Yvonne.*

*I suggested to Yvonne for her and Chris to have a one on one meeting to hash out the disconnect.*

*Yvonne works for PMO, she will only work on a project or additional tasks that comes from PMO or Arvin*

*Arvin does not want to work on or add any additional tasks/items until this current report is completed*

*Arvin stated that the metrics we use to calculate missed opportunities and dollars saved will not work for Staten Island and Brooklyn. They want actual/factual data. Not estimates. I will also follow up with Chris to give him a heads up."*

### Defendant ConEdison Approves Plaintiff's Religious Accommodation

72.     On or about March 21, 2022, Plaintiff finally heard back from Defendant ConEdison regarding her religious accommodation.

73.     Plaintiff received an email from Defendant ConEdison's Office of Diversity notifying her that her religious accommodation was approved.

**Manager Yee-Chan Creates Outrageous, Unachievable Project Requirements**

74.    Before Plaintiff could set up a meeting with Manager Yee-Chan to request to be placed back in her previous Regional Coordinator position, on or about March 24, 2022, Plaintiff received an email from Manager Yee-Chan assigning her to a Paving Pilot Check Project in Manhattan.

75.    Each week, Plaintiff was to drive by herself to the Department of Transportation project locations scheduled to be milled that week—as many as 19 locations in one day, and document and take photos of a list of items of concern.

76.    Manager Yee-Chan further insisted that Plaintiff was required to visit all of the locations for the entire week in one day to take photos of the items of concern. There was no rational business reason for Plaintiff to visit all of the locations in one day.

**Manager Yee-Chan Places Plaintiff's Safety at Risk and Forces her to Break the Law**

77.    Even though it was standard for two employees to be assigned to the Paving Pilot Check Project, Plaintiff was assigned the project by herself. Two employees should have been assigned to the project so that one of the employees could drive while the other employee took the photos, as required to comply with New York Vehicle and Traffic Law § 1225-d, which prohibits the use of portable electronic devices while operating a motor vehicle or while stopped in a location.

78.    Plaintiff was required to submit the report by the end of the day on Tuesdays each week. There was no rational business reason that Plaintiff visit all of the locations in one day.

79.    Sure enough, when Plaintiff was out on vacation, Manager Yee-Chan assigned <u>two</u> white, male employees to perform the Paving Pilot Check Project.

80.    In addition to being assigned to a project with outrageous requirements, on or about March 24, 2022, Manager Yee-Chan assigned Plaintiff to partner with Coworker Amy Amato ("Coworker Amato")—a white female, to manage the ProceMX Enhancement project. They were both responsible for making project enhancements.

**Not Surprisingly, Plaintiff is Unable to Successfully Complete her**
**<u>Assignment within the Specified Deadline Due to the Outrageous, Unachievable Project</u>**

81.    On or about the week of March 28, 2022, Plaintiff worked overtime to visit all 17 Paving Pilot Check Project locations without any assistance.

82.    Plaintiff was forced to navigate Manhattan by herself as she captured the required photos in violation of the law.

83.    Given the impossibility of completing the assigned project in one day and thereafter, submitting such a lengthy and detailed report, Plaintiff was unable to meet Manager Yee-Chan's Tuesday deadline and turned the report in a few days "late."

**<u>Plaintiff Reports Unsafe and Unlawful Employment Practices to EHS Manager Little</u>**

84.    Refusing to break the law in order to perform her job and concerned about her safety, on or about April 4, 2022, Plaintiff reached out to Defendant ConEdison Environmental Health and Safety Manager, Craig Little ("EHS Manager Little") and wrote the following email request:

*"Good morning Craig,*

*Our team is starting a new pilot here in Manhattan. The goal is to verify how many locations were actually milled based on the schedule the DOT provided to us. On average we are seeing roughly 18 project locations a week. I've attached the last two weekly schedules for your review, as well as the yearly schedule for 2022.*

*Week of 3/28/2022 - 17 Project locations*

*Week of 4/4/2022 - 19 Project locations*

*For the year we have roughly 185 project locations.*

*The items listed below are considered to be exceptions. If found, the person completing this assignment is expected to record and take pictures on each block included in the schedule.*

- *Con Ed material*

- *Plates*

- *Outdoor Dining*

- *Other construction*

- *Cone hives*

*My question is: How many locations on a weekly basis within a 2-day turn around each week can an employee safely get to while keeping driver safety at the forefront.*

*A few factors to be considered in this analysis:*

- *Quantity of locations*

- *The distance between locations scheduled*

- *Traffic*

- *Rush hour*

- *Road work*

- *Lane Closures*

- *Parking*

*Please feel free to contact me if you have any further questions or we can set up a quick call. Thank you."*

15

**Plaintiff is Written Up for Being Unable to Fulfill
Manager Yee-Chan's Outrageous Project Requirements**

85.     On or about April 4, 2022, Manager Yee-Chan requested to meet with Plaintiff regarding the Paving Pilot Check Project.

86.     During the meeting, Manager Yee-Chan aggressively reprimanded Plaintiff because she did not visit all 17 of the locations in one day and curtly let her know that since she failed to "meet his expectations," she was being written up.

87.     Plaintiff was shocked that after just 1 week working on a project, a manager at Defendant ConEdison would reprimand and punish an employee who was still so new to a project.

88.     Thereafter, Manager Yee-Chan threatened to place Plaintiff on a Performance Improvement Notice ("PIN"), in which employees are afforded a small narrow window of time to improve prior to termination. However, according to Defendant ConEdison Policies and Procedures, Defendant ConEdison Human Resources is required to be involved in any decisions to place an employee on a PIN and the employee must first receive a letter of reprimand. Thus, Manager Yee-Chan blatantly deviated from standard procedures.

89.     Manager Yee-Chan, thereafter, went on to state "at the last performance review we talked about perhaps finding a position, whether that's within, without, or outside of Con Ed, that would better suit your skills and abilities. I haven't seen you apply for any positions. Have you been seeking out any opportunities?"

90.     Plaintiff was, thereafter, forced to meet with Manager Yee-Chan each week, while all other coworkers were only required to meet with Manager Yee-Chan every two weeks.

**Plaintiff is Held to a Higher Standard than Similarly
Situated White Employees at Defendant ConEdison**

91.     On or about April 4, 2022, Manager Yee-Chan wrote in Plaintiff's feedback log and demanded that she provide him with Project Charters and Gantt Charts for each of the enhancements made on the ProceMX Enhancement project and create a separate MS Teams Channel—in addition to managing the tasks with the vendor, ProceMX.

92.     Despite the fact that Coworker Amato, a white female, was also responsible for making project enhancements, Coworker Amato never received these same expectations and requirements and was simply responsible for managing the tasks with the vendor alongside Plaintiff.

93.     Moreover, when the ProceMX Enhancement project was formerly managed by Project Specialist, Tony Coia ("Coworker Coia"), a white male, Manager Yee-Chan never required Coworker Coia to provide Project Charters, Gantt charts or create a separate MS Teams Channel.

94.     These time consuming and tedious expectations and requirements were only required of Plaintiff.

**EHS Manager Little Expresses Concern for Plaintiff's Safety**

95.     In response to Plaintiff's concerns of drivers' safety, on or about April 15, 2022, EHS Manager Little let her know that he was unable to provide a "safe" number of locations an employee could visit, as conditions change at any given moment. Thereafter, EHS Manager Little pointed out that in his opinion, it was unsafe for Manager Yee-Chan to instruct Plaintiff to take photos while driving due to the risk of distraction while searching for the listed items.

**Manager Yee-Chan Blames Plaintiff for his Own Error**

96.     On or about April 11, 2022, Manager Yee-Chan wrote in Plaintiff's Feedback Log that she failed to meet another manager's expectations on the SI dashboard assignment.

17

97.    In response, Plaintiff sent Manager Yee-Chan a rebuttal, pointing out that the reason the assignment did not meet the other manager's expectations had nothing to do with Plaintiff or her performance. Rather, the manager stated that he could not use Manager Yee Chan's estimates as he needed real data.

98.    Manager Yee-Chan was fully aware of this because Plaintiff informed him of the manager's reasoning on or about March 10, 2022, via text message.

### Plaintiff Reports Project Safety Concerns to Manager Yee-Chan

99.    On or about April 19, 2022, during a phone call with Manager Yee-Chan, Plaintiff reported that she did not feel comfortable or safe taking photos while driving her car and asked if she could take public transit as a safer alternative. Thereafter, Plaintiff reported that she felt it was impossible to successfully visit all of the locations in one day and asked Manager Yee-Chan to allow for slight flexibility and push the report deadline back even just one day.

100.    In response, Manager Yee-Chan grew angry and refused, He told Plaintiff that driving was a requirement of the Project Specialist position—suggesting that if she refused to drive, she would be promptly terminated from her position.

101.    In addition, Manager Yee-Chan refused to allow Plaintiff to submit the report at a later date and rigidly insisted that it was due every Tuesday.

102.    After the phone call, on or about April 19, 2022, Manager Yee-Chan sent the following email to Plaintiff:

*"Lynda,*

*As outlined in the 2H Position Guide, it is a job requirement of the Project Specialist position to have a valid driver's license and travel within the company service territory. I have heard your preference for mass transit, however driving can be a more efficient means*

18

*of transportation, covering 11 locations in under 3 hours. The team has also received company training to reinforce safe driving practices, you have facilitated some of those classes. The Paving Pilot report remains due on COB Tuesdays, and it is expected that employees use the most efficient means available to complete their tasks."*

**Plaintiff Reports Discrimination and Harassment to
Defendant ConEdison's Office of Diversity and Inclusion**

103.    Shortly after, Plaintiff called Defendant ConEdison's Business Ethics and Compliance Department and reported her safety concerns together with the discrimination and harassment she was subjected to at the hands of Manager Yee-Chan.

104.    In response, the department assured Plaintiff they would refer her case to Defendant ConEdison's Office of Diversity and Inclusion.

105.    In or about April 2022, Plaintiff received a call from Diversity and Inclusion Specialist, Deborah Cuevas Cherry ("ODI Cuevas Cherry") regarding her report of discrimination and unsafe practices at Defendant ConEdison.

106.    During the phone call, Plaintiff reported the gender, race, and religious discrimination she was subjected to, pointing out that she was treated differently and less-preferably than white, male employees at Defendant ConEdison—especially after her requested religious exemption.

107.    Plaintiff further reported her safety concerns in being solely assigned to a project in which she was forced to operate a vehicle while simultaneously capturing photographs.

108.    In response, ODI Cuevas assured Plaintiff that she would investigate her reports and asked her to send her an email, detailing specific examples of times where she was treated differently from her white, male peers.

19

**Manager Yee-Chan Offers Plaintiff Safe Alternative Only After
Learning of Plaintiff's Reports of Safety Concerns to EHS Manager Little**

109.    Upon information and belief, Defendant's Office of Diversity and Inclusion, thereafter, made EHS Manager Little aware of Plaintiff's reports of unsafe practices at Defendant ConEdison.

110.    On or about April 21, 2022, EHS Manager Little forwarded his previous response to Plaintiff to include Manager Yee-Chan.

111.    On or about April 22, 2022, Manager Yee-Chan sent the following response:

*"Lynda,*

*Work Coordination [is] in complete agreement with EHS. When driving, the driver should park their car and walk the route to prevent a possible MVC. Working safely is paramount. Driving remains a requirement of the 2H position."*

112.    Upon information and belief, Manager Yee-Chan knew that Plaintiff would not be able to successfully park and walk to each location due to the lack of parking in Manhattan as well as the long stretches of roads Plaintiff was required to photograph.

**Manager Yee-Chan Retaliates Against Plaintiff for her Reports to Defendant ConEdison**

113.    On or about April 22, 2022, Manager Yee-Chan suddenly submitted a request to re-open Plaintiff's 360 Assessment from October 5, 2021, to "enter additional comments and ratings" despite the fact that the report was already closed 6 months prior.

114.    Immediately after Plaintiff reported Manager Yee-Chan to Defendant ConEdison, Manager Yee-Chan sent Plaintiff an email letting her know that the new Department Manager, Lindsey Fitzgerald ("Manager Fitzgerald"), was a certified conflict resolution specialist and wanted to set up conflict resolution. Upon information and belief, the Office of Diversity and

20

Inclusion contacted Defendant ConEdison HR and Manager Yee-Chan, notifying them of Plaintiff's reports against Manager Yee-Chan.

115. During weekly meetings, Manager Yee-Chan became noticeably more hostile and demeaning.

### Plaintiff Reports Retaliation to ODI Cuevas Cherry

116. Immediately, Plaintiff called ODI Cuevas Cherry and reported that Manager Yee-Chan was retaliating against her, pointing out that after her reports of discrimination and unsafe practices, Manager Yee-Chan became very demeaning and further reported that he was attempting to re-open her 360.

117. In response, ODI Cuevas assured Plaintiff that she would include the retaliation as a part of her investigation.

118. Despite Plaintiff's reports to Defendant ConEdison, Manager Yee-Chan's request was approved and he, thereafter, entered negative comments that were not present prior to Plaintiff's reports and changed her scores.

119. When Plaintiff later confronted him about his sudden negative feedback, Manager Yee-Chan admitted changing the remarks in retaliation for Plaintiff's reports by noting that he was in an emotional state and was "not a robot and had feelings," revealing that he changed the remarks because he was angry that Plaintiff reported him to Defendant ConEdison.

### Manager Yee- Chan Retaliates Against Plaintiff
### for her Reports of Unlawful, Unsafe Practices and Discrimination

120. On or about April 25, 2022, after learning that Plaintiff reported being assigned to unsafe projects, Manager Yee-Chan was enraged. He wrote the following entry in Plaintiff's Feedback Log:

*"Excluding me from the initial conversation with EHS regarding safe work practices while performing field visits showed poor judgement. You raised concerns to EHS in private on 4/4 and did not include your manager in the conversation. EHS responded on 4/15 and their involvement and full opinions were obscured from me until discussed during out 4/21 feedback session. The implication that driving in Manhattan is 'unsafe' and 'not a good idea' did not characterize EHS full opinion. Driving safely, parking the vehicle, then observing is a safe way to perform field visits by car. I have never directed the team to drive and documents observations simultaneously."*

**Plaintiff is Continually Set Up for Failure at
Defendant ConEdison Due to Outrageous Project Requirements
that Were Never Required of Similarly Situated White, Male Employees**

121.    On or about the week of April 18, 2022, Plaintiff and Coworker Amato came up with approximately 11 ProceMX Enhancement project enhancements.

122.    On or about April 25, 2022, Manager Yee-Chan wrote in Plaintiff's weekly feedback log that she was impracticably expected to provide the Project Charters and Gantt Charts for 11 of the project enhancements by the end of that same week—despite being aware that Plaintiff was out on the field each Monday and Tuesday.

123.    As a result, Plaintiff was given 3 days to provide Project Charters and Gantt Charts for 11 project enhancements—an impossible task.

124.    When Plaintiff was unsurprisingly unable to complete this outrageous task within the time given, Manager Yee-Chan wrote negative remarks in her Feedback Log and later cited to it in her 2022-year performance review.

**Manager Yee-Chan Attempts to Turn Plaintiff's Teammates Against her**

125. During this time, it quickly became clear to Plaintiff that Manager Yee-Chan informed her teammates of her complaints against him.

126. Plaintiff's teammates suddenly excluded her from conversations, frequently engaged in inside jokes during meetings, and displayed a noticeable shift in their behavior towards her.

127. In addition, Coworker Karageorgos began making disparaging remarks about Plaintiff's leadership abilities, coupled with demeaning remarks such as, "the DOT told us what a great job you are doing—something that hasn't happened in a long time."

**Plaintiff Begins to Experience Severe Stress and Anxiety as a Result
of the Ongoing Discrimination and Harassment Occurring at Defendant ConEdison**

128. Throughout March 2022 and April 2022, Plaintiff developed debilitating anxiety and stress as she realized that Manager Yee-Chan would do anything to terminate her.

129. Plaintiff was unable to sleep, as she lay awake at night anxiously anticipating the ongoing harassment she would be subjected to the following day.

130. After Plaintiff began seeing a therapist, who strongly recommended that Plaintiff take time off of work to focus on her mental health, as Plaintiff's physical and mental health were continually declining.

**Plaintiff Reports Retaliation and Harassment to Defendant ConEdison**

131. On or about April 28, 2022, Plaintiff sent the following email to ODI Cuevas Cherry, reporting harassment and retaliation at Defendant ConEdison:

> *"Hello,*
>
> *The harassment and retaliation is getting worse. I no longer feel safe physically or psychologically working here at Con Edison. I fear for my safety. Brian is very*

*angry that I consulted with EH&S on safe practices to complete this pilot without including him in the email. Please see his retaliation documented in the feedback log.*

*What am I to do next? I am lost. Each time I read an email from Brian, my heart starts palpitating and I start to have trouble breathing.*

*I know that the company does not tolerate retaliation. I sense that he has informed others in the team of my complaint against him trying to turn my teammates against me.*

<u>*We Do Not Tolerate Retaliation*</u>

*We should feel comfortable seeking advice and reporting concerns of misconduct. Con Edison strictly prohibits retaliation, threats, or harassment toward any employee for making a report in good faith, or participating in an investigation."*

132.    On or about April 28, 2022, Plaintiff also forwarded ODI Cuevas Cherry Manager Yee-Chan's aggressive emails to Coworker Crawford in which he abruptly terminated her employment and demanded that she immediately return her computer and equipment after she was late to a meeting. Plaintiff wrote the following: "I am not the first Black female that Brian [Manager Yee-Chan] has discriminated against and looked to release from employment. Please see email below. Thanks"

**Plaintiff is Held to a Higher Standard than Similarly**
**Situated White Male Coworkers at Defendant ConEdison**

133.    From April 29, 2022, to May 13, 2022, Plaintiff was out on vacation.

134.    During this time, Manager Yee-Chan assigned two white, male employees to complete the paving pilot check field visits.

24

135.    While Manager Yee-Chan rigidly required Plaintiff to finish and submit her reports for the paving pilot check field visits by the end of the day each Tuesday and threatened to write her up if she failed to meet these expectations, Manager Yee Chan allowed the white, male employees to hand the reports in on Wednesday, May 4, 2022, and Wednesday, May 11, 2022. Upon information and belief, neither employee was written up despite failing to meet the expectation to complete and submit the paving pilot check by the end of the day on Tuesday.

136.    On or about Monday, May 16, 2022, Plaintiff was on the field completing her weekly paving pilot check visits—as she did every Monday.

137.    On or about May 16, 2022, Manager Yee-Chan dishonestly wrote in Plaintiff's feedback log that she was "AWOL" for the Right Start Meeting that day, despite that fact that Manager Yee-Chan was aware that Plaintiff was on the field each Monday and thus, could not possibly attend the meeting.

**Plaintiff Reports Race and Gender Discrimination to Defendant ConEdison**

138.    On or about May 22, 2022, Plaintiff sent the following email complaint to ODI Cuevas Cherry, reporting and pointing out that she was being held to a different standard than similarly situated white employees at Defendant ConEdison:

*"Hello Deborah [ODI Cuevas Cherry],*

*Below is an example of a difference in expectation from Brian of myself versus the other employees on his team.*

*Brian's expectation for me is to complete the Paving Check Pilot and hand in the report no later than COB Tuesday's. This is indicated in the Paving Checks Pilot email thread dated March 30, 2022 at 1:34pm and on April 6, 2022 at 8:08am where he says the full report is due on Tuesday.*

*This is not Arbitrary. I am expected to record and take pictures on each block included in the schedule of any of the exceptions listed below.*

*I've attached two sample copy of what the weekly DOT paving schedule looks like. The exceptions are:*

- *Con Ed material*

- *Plates*

- *Outdoor Dining*

- *Other construction*

- *Cone hives*

- *Shunts*

*1am expected to report to my assigned workout location first then go head to the field locations. This is indicated in the Paving Checks Pilot email thread dated April 1, 2022 at 3:38pm.*

*Naming convention must be indicated in each picture. This is indicated in the Paving Check Pilot email thread dated April 6, 2022 at 8:08am.*

*Document photos of exceptions using the following format:*

*1. Folder with date exception observed (Created in the Manhattan Commodity Leaders Channel. Please continue the naming convention for new observations)*

*2. Subfolder with associated paving project number (Created in the Manhattan Commodity Leaders Channel. Please continue naming convention for new observations.)*

*3. Filename with brief description of exception*

26

*\*\*\*Please note that the Pavina Pilot Checks email is locked by Brian. I cannot print, copy, forward, print screen the email or CC myself or anyone else in that email. So if you need access to that email, please ask him to provide it to you.*

*For now I have inserted that email to this one. Hopefully that allows you to be able to view it.*

*\*\*\*You may also want to ask for access to the Manhattan Commodity Leaders SharePoint Channel.*

*After the first week of completing the Paving Check Pilot, Brian conducted a disciplinary meeting with me on 4/4/2022 at 12pm and told me that I would be put on a PIN if he did not see improvements in the Paving Check Pilot.*

*Brian said he explicitly told me to visit the 17 locations on the Weekly Resurfacing Scheduler dated 3/28/2022 in one day. Because I did not do this, I did not meet his expectation. This expectation as you can see was a setup for failure.*

*At that time he reiterated that he wanted me to leave his group. He reminded me that he told me to leave his group on 2/22/2022 during my 2021 Performance Review feedback, and To Date (4/4/2022) he has not seen me apply for any jobs.*

*I was away on vacation from 4/29/2022 - 5/13/2022. While I was away on vacation, Brian had two (Caucasian male ) employees complete the paving pilot check field visits.*

*First observation is that both employees completed and handed in their report on a Wednesday (May 4, 2022 and May 11, 2022), not Tuesday. See attached Photos and links:*

***My question is:***

- *Did both employees report to their assigned workout location first before heading to conduct the field visits?*

27

- *If not, were they paid for their commuting time?*

- *Were these two Caucasian employees disciplined or told that they would be put on a PIN for not meeting expectation as I was?*

- *Were they told that they did not meet his expectation?*

*\*\*\*These examples I have listed in this email clearly depicts the difference in treatment by Brian towards me versus my Caucasian colleagues."*

**Plaintiff Continually Reports Race and Gender Discrimination to Defendant ConEdison**

139.    On or about May 22, 2022, Plaintiff sent the following email complaint to ODI Cuevas Cherry, reporting and pointing out that she was being held to a different standard than similarly situated white employees at Defendant ConEdison:

*"Hello Deborah [Cuevas Cherry],*

*Below is a second example of the difference in expectation from Brian of myself versus other employees on his team.*

*I was assigned to partner with another employee, Amy Amato (Caucasian female) to manage the ProceMX Enhancement on 3/24/2022. Amy Amato was originally assigned to lead this effort. I was added on afterwards to partner with her. Please see email from Brian dated 3/24/2022. The direction was that both Amy and I would be responsible for these enhancements.*

*In the feedback log for week of 4/4/2022 first page fifth bullet, I was required to provide Brian with Project Charters and Gantt Charts for each of the enhancements in addition to managing these tasks with the vendor ProceMX. However, Tony Coia (Caucasian male) sent the email detailing the ProceMX Enhancement tasks that are pending on 4/14/2022. There are a total of 16 enhancements listed. Brian is copied on the email listed below.*

28

*When Tony Coia had this assignment, he was not required to provide Project Charters, Gantt charts or create a separate MS Teams Channel for any of these tasks listed below. Same task, different expectations.*

*Neither is Amy Amato expected to provide Project Charter or Gantt Charts for these enhancements. This is an expectation that no one else in the group has been asked to do.*

*As of the 4/25/2022 weekly feedback log Page 2 fourth bullet, Brian's expectation was that I provide the Project Charters and Gantt Charts for 11 of the enhancements.*

*At that time, it had only been one week since I was made aware of what the enhancements were. Please also note that I am in the field two days a week (Mondays & Tuesdays) conducting the paving check pilot field visit. So in actuality, I only had 3 days to review and provide Brian with the Project Charters and Gantt Charts for the 11 enhancements. This is a second example of a setup for failure ar a difference of expectation of myself versus my peers for the same tasks.*

***My question is:***

- *How long was each of these enhancement request with Tony?*

- *When was he was expected to address them?*

- *Was he disciplined or told he did not meet expectation for having them too long in his inbox?*

- *Was he told that he would be put on a PIN?*

- *Why wasn't he also expected to provide Project Charter, Gantt Chart or create a separate MS Teams Channel for each enhancement?*

*Tony and I are both 2H Project Specialist who was hired in the group at the same time."*

29

140.    On or about May 22, 2022, Plaintiff sent the following email to ODI Cuevas Cherry,

explicitly reporting the discrimination she was subjected to at Defendant ConEdison:

*"Hello Deborah [ODI Cuevas Cherry],*

*Below is a third example of the difference in expectation from Brian of myself versus other
employees on his team.*

*Christos Karageorgos (Caucasian male) and I was assigned to work on the Staten Island
Dashboard. Christos had been working on the SQL part of the project since minimum
January 6, 2022. Please see email thread (Question about Construction Cross Commodity
database on ASQLVAN12D) on January 6, 2022 at 2:04pm. Brian is copied in on all of
these emails from the stakeholders.*

*Please also see email (View for Agenda Filtered Data) from Section Manager Ned
Mekhaiel dated March 7, 2022 at 2:33pm stating that Christos is holding up finalizing the.
report and another email from Electric PMO\*Yvonne Xiao asking Chris for additional
information on 3/7/2022 at 12:07pm because the original one provided did not work.*

*This is the same Staten Island Dashboard project that Brian was not honest and truthful
when he said that I did not meet Arvin's expectation in the other email I sent you. I texted
Brian on 3/10/2022 informing him that Arvin considers the report to be 0% complete until
they receive good working data from Christos. Arvin also stated that he did not want to
work on or add any additional tasks/items until this current report was completed.*

*My question is:*

- *Was Christos disciplined or told he did not meet expectation for holding up critical
  reports by Electric Operations stakeholder?*

- *Was he told that he would be put on a PIN?"*

30

141.    On or about May 22, 2022, Plaintiff sent the following email to ODI Cuevas Cherry, reporting Manager Yee-Chan's unequal and retaliatory treatment of Plaintiff:

*"Hello Deborah,*

*After thinking about it and with much prayer, I have concluded that conflict resolution between Brian and I will not work. We are beyond conflict resolution. There is no trust, consideration or fairness from him towards me. He is also not honest and truthful.*

*Please see my 360 assessment version 2 where he listed me as a 1 (lowest score) in every category.*

*Brian is identified as Manager 1. In looking at the assessment his ratings were the lowest compared to the 14 other people who rated me and provided feedback.I have provided both the revised and the original assessment as a comparison.*

*Attached are examples of Brian not being honest and truthful in the weekly feedback logs that he sends to me every week. There are countless other examples.*

*In the feedback log for week of 4/25/2022 which he emailed to me on 4/26/2022 (page 3), Brian says he did not receive an invitation to submit a manager review when it was sent to him on 4/22/2022.*

*I followed up with Performance Management to rectify the issue. As it turns out, Brian did receive the invitation and entered his remarks on 4/25/2022.*

*However, in my feedback log received on 4/26/2022, Brian states he didn't receive it.*

- *Be prepared to discuss feedback from your 360 review next Thurs 4/28*
  - *I did not receive an invitation to submit a 'manager' review*
  - *It is customary to review feedback with your manager*

*A second example of Brian not being honest and truthful in the weekly feedback log 5/16/2022 page 3 third bullet, Brian listed me as AWOL for not attending the Right Start Meeting, however Brian is aware that I am in the field on Monday's completing the Paving Pilot Checks visit.*

*A third example of Brian not being honest and truthful is his feedback in regards to the Staten Island Dashboard. Please see Feedback for week of 4/11/2022 page 3 where Brian indicates that the assignment SI dashboard does not meet Arvin's expectation.*

*In my Feedback for week 4/11/2022 rebuttal, I informed Brian that this assignment does not meet Arvin's expectation as he does not agree with the way Cross Commodity Work Coordination Group calculates Missed opportunities for Queens, Manhattan, and the Bronx. His vision is to be able to calculate actual misses not an estimate. Arvin stated the metrics Brian uses to calculate missed opportunities and dollars saved will not work for Staten Island and Brooklyn. He wants actual/factual data. Not estimates. This has to get approval by Electric PMO. Please see the text message I sent to Brian regarding this on 3/10/2022 below."*

142.    On or about May 26, 2022, Plaintiff sent the following email to ODI Cuevas Cherry, reporting Race and gender discrimination at Defendant ConEdison:

*"Hello Deborah [ODI Cuevas Cherry],*

*Below is a fourth example. In this example you can see the difference with how work performance is addressed by Brian relative to a Caucasian male on his team versus the Black females on his team. Please see attachments.*

*Although Ivan Khilko (Caucasian male) exhibited some work performance issues, he was allowed to continue working, even got his contract renewed with the company. Whereas Tiffany Crawford (Black female), was let-go immediately.*

*Please see email attachment where it reflects how he immediately fired Tiffany Crawford after she missed a meeting.*

*Additionally, the same male Caucasian employee who has documented performance issues from last year is being put in the role that I (Black Female employee) was hired for (Regional Leader).*

*This is after, Christos Karageorgos, another Caucasian male was immediately put in my place after I returned from FMLA Leave on 1/13/2022. Chris is resigning from the company as of 5/27/2022.*

***My question is:***

- *Why is performance issues handled differently for the Caucasian male employee versus the Black female employees in Brian's group?*

- *Why is this employee being rewarded to take on a Lead role in spite of documented performance issues by Brian whereas the Black female employees are either immediately released from their duties or being harassed and retaliated against?"*

**Plaintiff is Forced to Go Out on Short-Term Disability Leave
Due to the Stress and Anxiety of the Hostile Work Environment**

143. Four months after Plaintiff's initial reports of discrimination and retaliation, Plaintiff still had not received an update on the status of her complaints.

144. Throughout May and June 2022, Plaintiff's anxiety worsened as she was continually forced to endure weekly meetings with Manager Yee-Chan in which he harshly criticized her work, talked down to her, and spoke in an aggressive and hostile tone.

33

145.    Following the advice of her therapist, in or about June 2022, Plaintiff submitted a doctor's note to Defendant ConEdison's Employee Wellness Center, notifying them of her short-term disability leave.

146.    In or about June 2022, Plaintiff went on FMLA leave.

147.    On or about August 16, 2022, ODI Cuevas Cherry sent the following email to Plaintiff updating her on the status of her complaints of discrimination and harassment:

*"Good day Lynda,*

*The Office of Diversity & Inclusion has reached its conclusion concerning your complaint. Upon your return to work, please reach out to me so that we may discuss the finding. I can be reached via email [cuevascherryd@coned.com](mailto:cuevascherryd@coned.com) or at (646) 877-5742.*

*Regards,*

*Deborah Cuevas Cherry"*

**Defendant ConEdison Attempts to Force Plaintiff
to Continually Work Alongside Manager Yee-Chan**

148.    On or about February 1, 2023, Plaintiff returned from FMLA leave.

149.    On or about February 1, 2023, Plaintiff attended a scheduled meeting with Manager Lindsey Fitzgerald.

150.    During the meeting, Plaintiff reported that she did not feel physically safe working alongside Manager Yee-Chan and did not feel comfortable running into him at work or being assigned to a project in the same building as him and explicitly reported that she felt "traumatized" by his treatment.

151.    Plaintiff requested to work out of Defendant ConEdison's 4 Irving Place offices or work completely remote.

34

152.   In response, Manager Lindsey Fitzgerald coldly responded, "the assignment is in Bruckner Blvd"—immediately refusing Plaintiff's request.

153.   Plaintiff recalled that a former manager she ran into offered her the opportunity to work with his team on the CORE project and desperately begged Manager Fitzgerald to allow her to work with their team in the meantime until she was able to discuss her investigation with ODI Cuevas Cherry.

154.   Manager Fitzgerald appeared visibly irritated and reluctantly agreed.

155.   Thereafter, Manager Fitzgerald went on to discuss Plaintiff's upcoming Performance Review and insisted that it would be administered in-person with herself, Plaintiff, and Manager Yee-Chan.

156.   Plaintiff was immediately taken aback because for the past two years, her reviews were virtually conducted via Teams.

157.   When Plaintiff again, reported that she did not feel comfortable meeting with Manager Yee-Chan as she did not feel safe, Manager Lindsey Fitzgerald grew annoyed and even angered by Plaintiff's requests and begrudgingly agreed to the arrangement of herself and Plaintiff meeting in person with Manager Yee-Chan on Teams.

### Plaintiff Meets with ODI Cuevas Cherry Regarding the Investigation

158.   On or about February 6, 2023, Plaintiff sent an email to ODI Cuevas Cherry requesting to speak with her to go over her findings of the investigation.

159.   On or about February 15, 2023, Plaintiff met with ODI Cuevas Cherry and her manager via Teams.

160.   During the meeting, ODI Cuevas Cherry insisted that they investigated her reports and concluded that there were no findings that Manager Yee-Chan discriminated against Plaintiff based on her religion or requested religious accommodation.

161.   In response, Plaintiff asked "Well what about the race and gender discrimination and the harassment and retaliation?"

162.   At first, ODI Cuevas Cherry responded that she "did not recall [her] reporting retaliation," thus it was not investigated.

163.   Thereafter, ODI Cuevas Cherry changed her response and told Plaintiff that the retaliation was included as part of the overall investigation and that there were no findings.

164.   Plaintiff reminded ODI Cuevas Cherry that she sent a separate email on the issue of retaliation and that she assured her that it was going to be investigated separately.

165.   In response, ODI Cuevas Cherry insisted that she did not attribute Manager Yee-Chan's worsened harassment and attempts to turn her teammates against her to retaliation, but part of harassment and it was still not founded because it was not viewed as a separate charge—despite the fact that Plaintiff explicitly reported in her email that she was being retaliated against due to her reports of discrimination, harassment, and unsafe and unlawful practices,

166.   Thereafter, Plaintiff reminded her that in her emails, she requested Defendant ConEdison to investigate whether anyone else on the team received a 0% raise based on their 2021 performance review despite exceeding their Performance/Operational Excellence goals to determine whether this was an act of discrimination.

167.   In response, ODI Cuevas Cherry let Plaintiff know that raises were not something that would be investigated by ODI because they were "discretionary," dismissively told Plaintiff that her complaints were assessed, and ended the meeting.

36

168.    Yet, when Plaintiff checked Defendant ConEdison's Management Variable Pay Program policies, sure enough, raises were based on meeting Performance/Operational Excellence goals. Plaintiff exceeded her 2021 Performance/Operational Excellence goals and, based on her Band 2H Project Specialist level was entitled to receive a 9% raise.[4]

169.    On or about February 15, 2023, Plaintiff received the following letter from ODI Cuevas Cherry:

*"Dear Ms. LeGrand,*

*As we have discussed today, the Office of Diversity & Inclusion has completed our investigation into the discrimination issues raised in a recent matter involving you. Con Edison takes such complaints seriously and will not tolerate inappropriate conduct in the workplace.*

*We conducted a comprehensive review of the facts and circumstances, including interviewing relevant witnesses, including you, and reviewed applicable documents, data and practices/policies. Our investigation has concluded that the information gathered did not establish a violation of the Company's EEO policy.*

*If you have any additional concerns or questions regarding this matter, please feel free to contact me directly. We will contact you to schedule a follow-up interview to confirm that your concerns have been fully addressed, and to discuss any additional questions that you may have. Further, Con Edison does not tolerate retaliation of any kind. If you believe you have been subjected to any retaliation, please contact me to report it immediately so that it can be promptly addressed. Thank you again for bringing*

---

[4] See Exhibit B

37

*your concerns to this office.*

*Sincerely,*

*Deborah Cuevas Cherry"*

**Plaintiff's Year End Review is Ridden with False Statements and Disparaging Remarks**

170.    On or about March 1, 2023, Plaintiff met with Department Manager Fitzgerald in-person and Manager Yee-Chan via Teams for her 2022 Performance Review.

171.    Throughout the 22 years Plaintiff worked at Defendant ConEdison, she was always asked to participate in and be a part of the process of her performance review. With regards to the Defendant ConEdison's HR Policy Management Performance Review Guide, Managers are expected to encourage and solicit employee input when drafting a Performance Review.

172.    However, this time, Plaintiff was excluded from the process entirely and Manager Yee-Chan and Manager Fitzgerald wrote the review without any prior input from Plaintiff.

173.    Plaintiff sat and listened as Manager Yee-Chan and Manager Fitzgerald read off their false, disparaging remarks, including that Plaintiff was complained about by the DOT in 2022—Plaintiff never even met with the DOT in 2022, as she was assigned to Special Projects during that time.

174.    When Plaintiff received the review, she was in complete disbelief at the lies and disparaging statements about her, including that several coworkers complained about Plaintiff and no longer attended meetings because they did not want to work with Plaintiff.

175.    In addition, Manager Yee-Chan falsely stated that Josephine Ferguson from Performance Management complained to him about Plaintiff.

176.    However, when Plaintiff reached out to Josephine Ferguson on or about March 15, 2022, she insisted that she had never made any complaints to Manager Yee-Chan about Plaintiff—or anyone.

177.    Shortly after her review, Manager Fitzgerald began maternity leave.

178.    Thereafter, Plaintiff was managed by Section Manager, Kelly Ann Cassidy ("Section Manager Cassidy").

### Once Again, Plaintiff Reports Retaliation to Defendant ConEdison

179.    On or about March 17, 2023, Plaintiff responded to the Performance Review written by Manager Yee-Chan and Department Manager Fitzgerald via Rebuttal and sent the following email to Section Manager Cassidy, Performance Manager, Elizabeth Wynn; Performance Manager, Sheila George; Vice President of Gas Operations, Nicholas Inga; and Senior Vice President of Gas Operations, Katherine Boden, reporting the retaliation she was subjected:

*"Hello Kelly Ann,*

*I have read the 2022 Performance Review which covers from January 1, 2022 through December 31, 2022 and entered my Comments/Rebuttal. I have also attached a PDF copy of the Rebuttal for your review: official company documents which includes the 360-performance review, the weekly feedback logs, and the 2022 Performance Review.*

*I was very saddened to see the amount of lies/inaccuracies that was written in this document.*

*It is also very disheartening to see that Gas Operations Leadership would sign off on this document knowing that they are lies.*

39

*For example, Brian Yee-Chan states that many groups/individuals have complained to him about me including the DOT, to the point that they stopped attending my meetings.*

*I want to point out that I had zero interactions with the DOT in 2022. I was assigned Special Projects from January 13, 2022 - June 2, 2022.*

*Another example of a lie is that he states in the feedback log that Ms. Josephine Ferguson from Performance Management complained to him about me. I reached out personally and spoke with Ms. Ferguson on (March 15, 2022), and she stated she never reached out to Brian to make any complaints.*

*Additionally, Brian Yee-Chan is using THIS Performance Review document as a form of* ***RETALIATION.***

*In my 17 Years in Management, including the past 3 years in Work Coordination Group, this has never happened before. I was always given the opportunity to be a part of the Performance Review process. March 1, 2022, when I was administered the Performance Review was the first time, I got a glance as to what was written in it.*

*With Regards to the Company's HR Policy Management Performance Review Guide, Managers are expected to encourage and solicit employee input when drafting a Performance Review. Brian Yee-Chan violated the company's own HR Policy Management Performance Review by not including me in the process.*

*Once Brian Yee-Chan learned that I filed a complaint with ODI, it has been non-stop Retaliation.*

*I ask that you please review the document at your convenience for possible corrections. I am not able to sign it at this time. I will sign it once the corrections are made. I am not too*

40

*familiar with this part of the process (Rebuttal). So any guidance would be greatly appreciated.*

*Thank you in advance for your patience and your time."*

180.    In response, Kelly Ann Cassidy disregarded and ignored Plaintiff's reports of retaliation and simply wrote:

*"Thank you Lynda. I will follow up with the Performance Management team to determine next steps. My understanding is that at the bottom of the review, there is field where you can input the comments that you have written up in your rebuttal document."*

181.    In response, Plaintiff wrote:

*"Thank you Kelly Ann. I entered my Rebuttal in the comments as well. No one who has devoted 22 years of their life to a company should be going through this! I was on FMLA Leave for 8 months. I come back to work and I am still experiencing the same non-stop retaliation, harassment, targeting, and discrimination from Brian Yee-Chan."*

182.    On or about March 24, 2023, Kelly Ann wrote:

*"Hello Lynda, Thank you for your patience while I sought out additional guidance regarding your rebuttal. I met with Talent Management (Performance Management and Conflict Resolution) and HR regarding next steps. I was instructed that the Company Policy is that by signing your performance review, you are acknowledging that you had a meeting with your manager to discuss the review (In this case, the meeting was with Lindsey with Brian and myself in attendance) and not necessarily that you agree with the contents of the review. You are urged to document your rebuttal in the comments section of the review (which I believe you have already done). In my conversation with Performance Management, they noted that they had a conversation with you as well,*

41

*relaying the same message. Regarding the retaliation, harassment, discrimination that you describe in the email below (and the attachment), you can reach out to ODI to ask them to investigate the matter further. Additionally, you may want to consider CCA (Corporate Counseling Associates). CCA provides support, information, and referrals on a wide range of work or personal issues; counselors are available 24/7/365 and all calls are confidential. For services or to make an appointment, call CCA at 1-800-883-8707. Please let me know if there is anything else I can do to support you.*

*-Kelly"*

**Plaintiff is Forced to Apply to Other Jobs Out of Fear of Further Retaliation**

183.    Performance Manager, Elizabeth Wynn; Performance Manager, Sheila George; Vice President of Gas Operations, Nicholas Inga; and Senior Vice President of Gas Operations, Katherine Boden never responded to Plaintiff's rebuttal. Defendant ConEdison violated their own Corporate Policy on Management Performance Reviews.

184.    Shortly after Plaintiff's email, Section Manager Cassidy informed Plaintiff that Manager Fitzgerald let her know that as soon as she returned from maternity leave, Plaintiff would report to Manager Fitzgerald.

185.    Plaintiff immediately began to fear that when Manager Fitzgerald returned, the retaliation would only worsen given her recent reports against Manager Fitzgerald. Plaintiff began to fear that her job was likely in jeopardy and began applying to every position available at Defendant ConEdison.

186.    Plaintiff was forced to apply for jobs that paid significantly less than her current job and was forced to apply to jobs she had no interest or experience in.

187.    On or about March 22, 2023, Plaintiff applied for a position within the Defendant ConEdison's IT Digital Factory Department.

188.    During this time, Plaintiff received several glowing reviews due to her exceptional work and professionalism during the CORE project, including from CORE Lead, Raymond Horton.

189.    On or about June 6, 2023, Plaintiff received a job offer to work in the IT Digital Factory department as a Manager and began her new position on or about June 15, 2023.

190.    Presently, Plaintiff is forced to dedicate an extensive amount of time to grasp the intricacies of her new job and bridge the gap in inexperience. Faced with a significant learning curve, Plaintiff invests numerous hours a week in self-directed learning, diligently watching instructional videos to catch up and enhance her proficiency.

191.    On or about June 30, 2023, Plaintiff received an Amazon gift card, and Thank You note from General Manager Michael Murphy for her exceptional work on the CORE project.

## CLAIMS

### AS AND FOR PLAINTIFF'S FIRST CAUSE OF ACTION
*(Race Discrimination in Violation of 42 U.S.C. § 1981)*

192.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

193.    Defendant ConEdison has discriminated against Plaintiff in violation of 42 U.S.C. § 1981, by subjecting her to different treatment on the basis of her race. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant's wrongful conduct.

194.    Defendant ConEdison has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated white employees, and by subjecting her to disparate terms and other forms of discrimination on the basis of his race in violation of 42 U.S.C. § 1981.

195.    Defendant ConEdison's conduct was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

196.    By reason of Defendant ConEdison's discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

197.    As a result of Defendant ConEdison's violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $2,500,000.

### AS AND FOR PLAINTIFF'S SECOND CAUSE OF ACTION
*(Retaliation in Violation of 42 U.S.C. § 1981)*

198.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

199.    Plaintiff was an employee of Defendant ConEdison and is protected by 42 U.S.C. § 1981 from retaliation.

200.    Plaintiff complained to Defendant ConEdison about the race discrimination she was subjected to during her employment.

201.    Plaintiff's complaints were ignored and discouraged by Defendant ConEdison.

202.    Plaintiff notified Defendant ConEdison of the race discrimination she was subjected to and protested the harassment.

203.    Plaintiff's protest to Defendant ConEdison about the race discrimination she was subjected to during her employment with Defendant was a protected activity under 42 U.S.C. § 1981.

204.    In retaliation, Defendant ConEdison, unlawfully and without cause, and as a direct result of Plaintiff complaining about the incidents of race discrimination, interfered with the

employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of 42 U.S.C. § 1981.

205. Plaintiff reported and objected to Defendant ConEdison's retaliation; thus, Defendant knew about the retaliation and the effect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

206. The conduct of Defendant ConEdison was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

207. By reason of Defendant ConEdison's discrimination, Plaintiff is entitled to all remedies available for violations of 42 U.S.C. § 1981.

208. As a result of Defendant ConEdison's violation of 42 U.S.C. § 1981, Plaintiff has been damaged in the sum of no less than $2,500,000.

### AS AND FOR PLAINTIFF'S THIRD CAUSE OF ACTION
*(Race, Gender, and Religious Discrimination in Violation of Title VII)*

209. Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

210. Defendant ConEdison discriminated against Plaintiff in violation of Title VII by subjecting her to different treatment on the basis of her race, color, gender, and religion.

211. Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant ConEdison's wrongful conduct.

212. Defendant ConEdison has discriminated against Plaintiff by treating her differently from and less preferably than similarly situated, white males who never requested religious accommodations at Defendant ConEdison, and by subjecting her to disparate terms and conditions

45

of employment and other forms of discrimination on the basis of her race, color, gender, and religion in violation of Title VII.

213.    The conduct of Defendant ConEdison was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

214.    By reason of Defendant ConEdison's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

215.    As a result of Defendant ConEdison's violation of Title VII, Plaintiff has been damaged in the sum of no less than $2,500,000.

**AS AND FOR PLAINTIFF'S FOURTH CAUSE OF ACTION**
*(Retaliation in Violation of Title VII)*

216.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

217.    Plaintiff was an employee of Defendant ConEdison and is protected by Title VII from retaliation.

218.    Plaintiff complained to Defendant ConEdison about the race, color, gender, and religious discrimination she was subjected to during her employment with Defendant ConEdison.

219.    Plaintiff's complaints were ignored and discouraged by Defendant ConEdison.

220.    Plaintiff notified Defendant ConEdison of the race, color, gender, and religious discrimination she was subjected to and protested the harassment.

221.    Plaintiff's protest to Defendant ConEdison about the race, color, gender, and religious discrimination she was subjected to during her employment with Defendant was a protected activity under Title VII.

222.    Defendant ConEdison, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaining about the incidents of race, color, gender, and religious discrimination.

223.    Because she protested Defendant ConEdison's unlawful behavior, Plaintiff was subjected to retaliation.

224.    The retaliation substantially interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of Title VII.

225.    Plaintiff reported and objected to Defendant ConEdison's retaliation; thus, Defendant knew about the retaliation and the effect it had on Plaintiff's employment and failed to take any action to stop the retaliatory conduct.

226.    The conduct of Defendant ConEdison was intentional, deliberate, willful, malicious, reckless and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

227.    By reason of Defendant ConEdison's discrimination, Plaintiff is entitled to all remedies available for violations of Title VII.

228.    As a result of Defendant ConEdison's violation of Title VII, Plaintiff has been damaged in the sum of no less than $2,500,000.

**AS AND FOR PLAINTIFF'S FIFTH CAUSE OF ACTION**
*(Race, Gender, and Religious Discrimination in Violation of*
*The New York State Human Rights Law and the New York City Human Rights Law)*

229.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

230.    Defendant ConEdison has discriminated against Plaintiff in violation of the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law

47

("NYCHRL") by subjecting her to different treatment on the basis of her race, color, gender, and religion by treating her differently from and less preferably than similarly situated white, male employees who never requested religious accommodations.

231.    Plaintiff has suffered both disparate impact and disparate treatment as a result of Defendant ConEdison's wrongful conduct and suffered other forms of discrimination on the basis of her race, color, gender, and religion in violation of the NYSHRL and the NYCHRL.

232.    Defendant ConEdison's conduct was intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of Plaintiff, entitling Plaintiff to punitive damages.

233.    By reason of Defendant ConEdison's discrimination, Plaintiff is entitled to all remedies available for violations of the NYSHRL and the NYCHRL.

234.    As a result of Defendant ConEdison's violation of the NYSHRL and the NYCHRL, Plaintiff has been damaged in the sum of no less than $2,500,000.

## AS AND FOR PLAINTIFF'S SIXTH CAUSE OF ACTION
*(Retaliation in Violation of The New York State Human Rights Law and the New York City Human Rights Law)*

235.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

236.    Section 296.1(a) of the New York Human Rights Law, N.Y. Exec. Law § 290 *et seq.* and Title 8 of the New York City Administrative Code, § 8-107, *et seq.,* prohibits retaliation against an employee who seeks to assert rights under the Human Rights Laws. Defendant ConEdison is Plaintiff's employer within the meaning of those laws.

237.    Plaintiff repeatedly complained to Defendant ConEdison about the discrimination, harassment, and retaliation she suffered.

238.    In response to her protected activity, Defendant ConEdison retaliated against Plaintiff in the terms and conditions of her employment by giving her changes in workplace treatment and treating her disparately from other employees.

239.    Defendant ConEdison's actions were taken under circumstances giving rise to an inference of discrimination.

240.    As a direct and proximate result of Defendant ConEdison's discriminatory conduct, Plaintiff has suffered adverse employment consequences. Plaintiff has also been forced to endure severe emotional pain and trauma and the physical effects thereof, all to her detriment.

### AS AND FOR PLAINTIFF'S SEVENTH CAUSE OF ACTION
*(Whistleblower Retaliation in Violation of New York Labor Law § 740)*

241.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

242.    As an employee at Defendant ConEdison, Plaintiff was assigned projects which required her to use a portable electronic device to take photos while operating a motor vehicle or while stopped in a location.

243.    These practices violated New York Vehicle and Traffic Law § 1225-d, which prohibits the use of portable electronic devices while operating a motor vehicle or while stopped in a location.

244.    Plaintiff objected to these practices by refusing to engage in unlawful behavior and reported concerns of safety to Defendant.

245.    In retaliation, Defendant ConEdison unlawfully and without cause, and as a direct result of Plaintiff complaining about the unlawful activities and practices at Defendant ConEdison, interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment.

49

246.    Plaintiff is entitled to recover compensatory damages, punitive damages, attorneys' fees and costs, and pre-and post-judgement interests together with such other relief as this Court deems just and proper.

### AS AND FOR PLAINTIFF'S SEVENTH CAUSE OF ACTION
*(Retaliation in violation of New York Labor Law § 215)*

247.    Plaintiff re-alleges and incorporates by reference each and every allegation in each and every aforementioned paragraph as if fully set forth herein.

248.    As an employee at Defendant ConEdison, Plaintiff was assigned projects which required her to use a portable electronic device to take photos while operating a motor vehicle or while stopped in a location.

249.    These practices violated New York Vehicle and Traffic Law § 1225-d, which prohibits the use of portable electronic devices while operating a motor vehicle or while stopped in a location.

250.    Plaintiff objected to these practices by refusing to engage in unlawful behavior and reported concerns of safety to Defendant.

251.    In retaliation, Defendant ConEdison unlawfully and without cause, and as a direct result of Plaintiff complaining about the unlawful activities and practices at Defendant ConEdison, interfered with the employment of Plaintiff and created an intimidating, offensive, and hostile work environment in violation of the NYLL.

252.    Plaintiff complained to Defendant ConEdison about the retaliation she was subjected to in violation of NYLL.

253.    In retaliation, Defendants subjected Plaintiff to worsened harassment and continually subjected her to a hostile work environment.

254.    Plaintiff is entitled to recover compensatory damages, punitive damages, attorneys' fees and costs, and pre-and post-judgement interests together with such other relief as this Court deems just and proper.

## JURY DEMAND

255.    Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendant for all compensatory damages, mental pain and suffering damages, statutory liquidated damages, and punitive damages, as well as the costs and disbursements of this action, including reasonable attorneys' fees incurred in pursuing these claims, together with such other and further relief as this court deems equitable, proper, and just.

Dated: New York, New York
      January 19, 2024

Respectfully submitted,

GODDARD LAW PLLC

By: /s/ Megan S. Goddard
    Megan S. Goddard, Esq.
    39 Broadway, Suite 1540
    New York, New York 10006
    Of: (646) 964-1178
    Megan@goddardlawnyc.com

*Attorneys for Plaintiff Lynda LeGrand*